# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v SWILLEY

Docket No. 154684. Argued on application for leave to appeal March 7, 2019. Decided July 17, 2019.

Kareem A. Swilley, Jr., was convicted following a jury trial in the Saginaw Circuit Court of first-degree premeditated murder, MCL 750.316(1)(a); conspiracy to commit murder, MCL 750.157a; three counts of assault with intent to commit murder, MCL 750.83; carrying a dangerous weapon with unlawful intent, MCL 750.226; and six counts of possession of a firearm during the commission of a felony, MCL 750.227b, in connection with the drive-by shooting death of DaVarion Galvin. Defendant asserted an alibi defense, stating that he was at city hall at the time of the shooting with his grandmother Alesha Lee, Lee's fiancé Philip Taylor, and defendant's sister. Taylor and Lee corroborated defendant's testimony at trial, and texts between defendant and one of his codefendants around the time Galvin was shot appeared to suggest that defendant was not with the codefendant at that time. Over defense objection, the court, Frederick L. Borchard, J., extensively questioned Taylor, Lee, and Joshua Colley (a witness who was present when Galvin was shot). The jury found defendant guilty of all charges. Defendant appealed in the Court of Appeals, arguing that the trial judge's questioning of witnesses pierced the veil of judicial impartiality and denied him a fair and impartial trial under *People v Stevens*, 498 Mich 162 (2015). In an unpublished per curiam opinion of the Court of Appeals, issued September 13, 2016 (Docket Nos. 323313, 325530, and 325806), the Court of Appeals (TALBOT, C.J., and O'CONNELL and OWENS, JJ.), affirmed defendant's convictions but remanded the case for correction of defendant's sentence for conspiracy to commit murder. Defendant sought leave to appeal, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 503 Mich 868 (2018).

In an opinion by Justice BERNSTEIN, joined by Chief Justice MCCORMACK, and Justices VIVIANO, CLEMENT, and CAVANAGH, the Supreme Court, in lieu of granting leave to appeal, *held*:

The judge's improper questioning of Taylor, a key alibi witness for defendant, pierced the veil of judicial impartiality and violated defendant's constitutional right to a fair trial under *Stevens*.

1. Under MRE 614(b), a trial judge is generally permitted to ask questions of witnesses; however, the central object of judicial questioning should be to clarify. In that regard, a trial judge may question witnesses to produce fuller and more exact testimony or elicit additional relevant

information, and the judge may intervene in a trial to expedite matters, prevent unnecessary waste of time, or clear up an obscurity. Judicial questioning might be more necessary when a difficult witness refuses to answer questions or provides unclear answers. Conversely, judicial intervention is less justified when a witness's answers are clear and responsive. Undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward a witness may tend to prevent the proper presentation of the cause or the determination of the truth. For that reason, a judge should avoid questions that are intimidating, argumentative, or skeptical. It is not the role of the court to impeach a witness or undermine a witness's general credibility. Similarly, a judge should not emphasize or expose potential weaknesses in a witness's testimony or convey the judge's personal view on whether a witness should be believed. Questions from a judge that are designed to emphasize or expose incredible, unsubstantiated, or contradictory aspects of a witness's testimony are impermissible. In the context of judicial questioning, a judge is not tasked with making substantive points or arguments, and questions that, in essence, advocate are not within prescribed judicial authority. The credibility of a witness should be tested by cross-examination, not by judicial inquisition.

2. Under *Stevens*, a trial judge's conduct before a jury deprives a party of a fair and impartial trial when the conduct pierces the veil of judicial impartiality. The conduct violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. Evaluating the totality of the circumstances is a fact-specific analysis that involves a consideration of various factors, including the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of the trial. The list of factors is nonexhaustive, and a reviewing court may consider additional factors if they are relevant to the determination of partiality in a particular case. Not every factor has to weigh in favor of the conclusion that the judge demonstrated the appearance of partiality; in other words, the cumulative effect of the errors, not the effect of each error standing alone, must be considered when making that determination. When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review; a structural error has occurred and automatic reversal is required. When the judge's conduct involves judicial questioning, a witness's lack of memory is not equivalent to a lack of clarity, and a judge should let such unambiguous testimony stand. With regard to considering the scope of judicial intervention within the context of the length and complexity of the trial and issues therein, a court must evaluate both the length of the trial and the complexity of the particular issues that were subject to judicial inquiry. In a long and complicated trial, it may be more appropriate for a judge to intervene a greater number of times than in a shorter or more straightforward trial. A judge's inquiries may be more appropriate when a witness testifies about a topic that is convoluted, technical, scientific, or otherwise difficult for a jury to understand. In contrast, when a witness testifies on a clear or straightforward issue, judicial questioning is less warranted, even if the testimony occurs within the context of a lengthy trial, or one that involves other complex but unrelated matters. Said differently, when testimony deals with a particular issue or topic that is not complicated or complex, the utility of judge-led questioning is more limited. Accordingly, judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct.

3.  In this case, the trial judge repeatedly challenged Taylor's clear, responsive testimony in a manner that closely resembled prosecutorial cross-examination.  The questions cast suspicion on Taylor's testimony and his reasons for being on the stand, which impeached and undermined Taylor's general credibility.  Moreover, the questioning did not clarify any of the issues or produce fuller testimony.  Although the judge's questioning of Taylor alone weighed in favor a determination that the court pierced the veil of judicial impartiality, aspects of the judge's questioning of Lee and Colley were similarly problematic.  The judge's questions impermissibly drilled into defendant's alibi defense and were inappropriately designed to assess the believability of witnesses presented in support of that defense.  In addition, the judge's questions were imbalanced in both frequency and manner, decidedly in the prosecution's favor.  In sum, the nature of the trial judge's questioning of defendant's key alibi witness, Taylor, the judge's tone and demeanor during the questioning, the scope of the intervention in light of the relatively straightforward testimony at issue, and the imbalanced direction of the intervention, all support the conclusion that the judge pierced the veil of judicial impartiality.  Although the judge issued curative instructions to the jury, the judge's words repeatedly conflicted with his actions throughout the trial.  Consequently, the curative instructions were not sufficient to overcome the partiality the judge exhibited against defendant.  Considering the totality of the circumstances, it was reasonably likely that the judge's questioning of Taylor improperly influenced the jury by creating an appearance of advocacy or partiality against defendant.  Accordingly, the judge's improper questioning of Taylor pierced the veil of judicial impartiality and violated defendant's constitutional right to a fair trial under *Stevens*.

Reversed and remanded for a new trial.

Justice MARKMAN, joined by Justice ZAHRA, concurring in the judgment, agreed with the majority that certain aspects of the trial judge's questioning were inappropriate and concluded that defendant was entitled to a new trial for the reasons stated in Justice ZAHRA's concurring opinion, which Justice MARKMAN joined in full.  Justice MARKMAN wrote separately to emphasize that the goal of judicial questioning is to assist the jury in its truth-seeking function without compromising the jury's ability to independently render a verdict.  Trial judges should not be reluctant, or even hesitant, to employ judicial questioning under MRE 614(b) in order to assist the jury in its truth-seeking function as long as the questioning does not signal to the jury the judge's personal opinion such that it erodes the jury's role as fact-finder. Judges have broad discretion to question witnesses within those boundaries, even if the questions touch on the credibility of the witness or reveal evidence that is damaging to a party's case.  The key inquiry is whether the questioning signals to the jury the judge's personal opinion as to the veracity of the witness or as to the strength or weakness of a party's case, not whether the question itself touches upon issues of credibility or is intended to, or results in, harm to a particular party's case.  Because trial judges are generally better positioned than appellate judges to determine whether additional questioning would best aid the jury, appellate courts should afford reasonable deference to a trial judge's decision to question witnesses.  Moreover, notwithstanding references to the Code of Judicial Conduct in *Stevens* and the majority opinion in this case, improper questioning that entitles a party to a new trial should only rarely result in a judicial-disciplinary proceeding.  Trial judges are entitled to a strong presumption that any improper judicial questioning was undertaken in good faith and does not more generally reflect on their fitness for the bench. Justice MARKMAN wrote separately to express his concern that the majority's negative tone toward judicial questioning and overly aggressive appellate review, including its overly casual references to the Code of Judicial Conduct, could

make members of the bench hesitant to use their authority under MRE 614(b) to interrogate witnesses and thereby further the truth-seeking function of the criminal trial.

Justice ZAHRA, joined by Justice MARKMAN, concurring in the judgment, agreed with the majority that defendant was entitled to a new trial but disagreed that the case should be resolved under *Stevens*. Courts should not reach constitutional issues in cases that can be resolved on nonconsitutional grounds, and this case could have been resolved on nonconstitutional grounds. Specifically, relief should have been granted because the trial judge abused his discretion under MRE 614(b) when he posed several of his questions to Taylor, a key alibi witness for defendant, and when he intervened extensively. Because Taylor's credibility and veracity were necessary to defendant's alibi defense, it was more probable than not that the jury would have acquitted defendant but for the judge's improper questioning.

©2019 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 17, 2019

S T A T E O F M I C H I G A N

SUPREME COURT

PEOPLE OF MICHIGAN,

       Plaintiff-Appellee,

v

No. 154684

KAREEM AMID SWILLEY, JR.,

       Defendant-Appellant.

BEFORE THE ENTIRE BENCH

BERNSTEIN, J.

In this case, we consider whether the trial judge's conduct pierced the veil of judicial impartiality, depriving defendant of a fair trial. We conclude that it did. Considering the totality of the circumstances, we conclude that it was reasonably likely that the judge's questioning of defendant's alibi witness improperly influenced the jury by creating an appearance of advocacy or partiality against defendant, in violation of our decision in *People v Stevens*, 498 Mich 162; 869 NW2d 233 (2015). Accordingly, we reverse the judgment of the Court of Appeals and remand this case for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

This case arises from the shooting death of DaVarion Galvin. Defendant, Kareem Amid Swilley, Jr., and his codefendants, John Henry Granderson, Terrance Demon-Jordan Thomas, Jr., and Derell Martin, were tried jointly on charges related to the shooting. A jury ultimately convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a); conspiracy to commit murder, MCL 750.157a; three counts of assault with intent to commit murder, MCL 750.83; carrying a dangerous weapon with unlawful intent, MCL 750.226; and six counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1]

Galvin's shooting occurred on November 21, 2012. On that date, at approximately 2:30 p.m., Galvin, Willie Youngblood, Joshua Colley, and Marcus Lively were walking in the Bloomfield neighborhood in Saginaw, Michigan.[2] A dark-colored Saturn approached the group, and the occupants of the vehicle opened fire. Colley and Lively took cover, and they were not shot. Youngblood was struck once in the stomach but fled the scene and survived. Galvin was struck by multiple bullets and died in the hospital shortly thereafter. The police found nine-millimeter and .40-caliber shell casings at the location of the shooting. The car used in the drive-by shooting was later recovered, and a fingerprint on the vehicle matched that of codefendant Granderson.

---

[1] Codefendants Granderson and Thomas were convicted of the same charges as defendant. Thomas was also convicted of being a felon in possession of a firearm, MCL 750.224f, and of a seventh count of felony-firearm. Codefendant Martin was found not guilty of all charges.

[2] Evidence at trial suggested that Galvin, Youngblood, Colley, and Lively were members of a local gang and that defendant and his codefendants were members of a rival gang.

On December 25, 2012, about a month after the November 2012 shooting, an unknown person fired shots at the home that defendant shared with his grandmother. Police went to the home and saw four men running. Three stopped: defendant, codefendant Thomas, and Jamar Swilley. Although the fourth man escaped, he was seen making a throwing motion near the rear of a house. Two rifles were later recovered from under the porch of that home. In a nearby parking lot, the police also found a loaded nine-millimeter handgun with casings that matched those found at the scene of the November 2012 shooting. DNA recovered from the handgun matched that of codefendant Thomas.

In the days after the November 2012 shooting, the police interviewed Youngblood, who described the car used in the shooting as a black or blue midsize vehicle. The police showed Youngblood a photo array containing images of defendant and his codefendants, but Youngblood did not identify any of them as the perpetrators. However, Youngblood's account changed about a year later, after he was detained on a misdemeanor warrant. At the time, the police were also investigating Youngblood for possible involvement in a September 2013 shooting at the Cass River Market in Saginaw. During subsequent questioning, Youngblood suddenly named defendant and his codefendants as the perpetrators of the November 2012 shooting. Youngblood repeated these claims at the preliminary examination in this case, testifying that codefendant Granderson was the driver of the vehicle, that codefendant Thomas was in the front passenger seat, that defendant sat behind codefendant Thomas, and that a fourth man was also in the vehicle. He also testified that everyone in the vehicle had guns, except Granderson. Youngblood claimed that he had known defendant and codefendant Thomas before the shooting and that he had looked them up on Facebook to get their real names.

3

At trial, Youngblood changed his story yet again. On direct examination, Youngblood claimed that when the car approached, he only saw guns and the men's hair styles but that he did not know the perpetrators' names or see defendant in the car. Youngblood acknowledged his contradictory preliminary-examination testimony, but he maintained that other people had told him that defendant and his codefendants were involved in the shooting and that he did not personally recognize any of the men on the day of the incident. Youngblood later conceded that he could not positively identify defendant as being in the car and that it would not surprise him if defendant had not actually been in the car. Youngblood also admitted that he grew up being told that he should not speak with the police or testify in court and that he was worried his family would be retaliated against for him doing so. He acknowledged that he was testifying in exchange for a cap on his sentence arising from the Cass River Market shooting.

Defendant asserted an alibi defense, claiming that at the time of the shooting, he was at city hall with his grandmother, Alesha Lee, his grandmother's fiancé, Philip Taylor, and defendant's sister, Marcel Swilley. Both Taylor and Lee testified. Phone records from the day of the incident were also introduced at trial. The phone records showed that defendant received a text message from codefendant Thomas at 1:57 p.m., asking defendant to call him. At 2:35 p.m., defendant sent a text to an unidentified person asking, "[W]hat's up?" At 2:44 p.m., defendant texted another unidentified person, informing the person that he was going down to city hall to transfer property. At 2:48 p.m., Thomas texted defendant, "[B]ekupp." Defendant responded, asking, "[H]ow many down?" Thomas answered at 2:50 p.m., "[A]bout three."

4

At the close of trial, defendant was convicted as noted above. The trial judge sentenced defendant to concurrent prison terms of life without parole for conspiracy to commit murder, 37 to 75 years for first-degree premeditated murder, 18 to 36 years for each count of assault with intent to commit murder, and 38 months to 5 years for carrying a dangerous weapon with unlawful intent. These sentences were to be served consecutively to six concurrent terms of 2 years in prison for the felony-firearm convictions.

On appeal in the Court of Appeals, defendant raised several issues, including that the trial judge's questioning of witnesses denied him a fair and impartial trial. In an unpublished per curiam opinion, the Court of Appeals rejected that claim. *People v Granderson*, unpublished per curiam opinion of the Court of Appeals, issued September 13, 2016 (Docket Nos. 325313, 325530, and 325806).[3] The Court of Appeals affirmed defendant's convictions but remanded the case for a correction of defendant's sentence for conspiracy to commit murder.[4]

Defendant filed an application for leave to appeal in this Court.[5] On September 27, 2018, we ordered oral argument on the application. *People v Swilley*, 503 Mich 868 (2018).

---

[3] The Court of Appeals consolidated defendant's appeal with those of his codefendants.

[4] The Court of Appeals instructed that the sentence for conspiracy to commit murder be amended to life with the possibility of parole. *Granderson*, unpub op at 29.

[5] Codefendants Granderson and Thomas filed separate applications for leave to appeal in this Court. Those applications were held in abeyance. See *People v Granderson*, 917 NW2d 407 (2018); *People v Thomas*, 917 NW2d 84 (2018).

## II. THE TRIAL JUDGE'S QUESTIONING OF WITNESSES

In this appeal, defendant argues that the trial judge's questioning of witnesses pierced the veil of judicial impartiality, depriving him of a fair trial. Particularly at issue is the trial judge's questioning of three witnesses—Taylor, Lee, and Colley.

We note that at the start of trial, the trial judge issued preliminary instructions with respect to the judge's questioning of witnesses: "I may ask some questions of the witnesses myself. These questions are not meant to reflect my opinion about the evidence. If I ask a question, my only reason would be to ask about things that may not have been fully explored." At the close of trial, during his final instructions to the jury, the trial judge explained that he did not intend to express any opinion on the case and that if the jurors believed such an opinion had been conveyed, they should disregard it.

## A. PHILIP TAYLOR

Taylor's testimony was central to defendant's alibi defense. On direct examination by defense counsel, Taylor testified extensively about the time line of events on November 21, 2012, from his perspective. Taylor recalled that he, along with Lee, defendant, and defendant's sister, visited city hall to transfer a piece of property to defendant and defendant's sister. Taylor explained that the property, a home, had initially been in Lee's name but that it had since been transferred to Taylor's name. Lee wanted legal title transferred to defendant and defendant's sister because Lee had been diagnosed with cancer and wanted to ensure that the home went to her grandchildren. Taylor elaborated, stating that they

> [w]ent down there to [city hall] that day and had the house signed over out
> of my name into [defendant's] and [defendant's sister's] name.

6

Must have left the house right around about 2:00. Got down there—I think about three departments down there. I might have paid my water bill and then went to sign—got their name signed off at the front desk up there. Everybody had to show their ID to get their name signed over. Then we left there, and we got it notarized.

A quitclaim deed stamped November 21, 2012, was entered into evidence, bearing the signatures of defendant, defendant's sister, and Taylor, with Taylor's signature notarized.[6] Taylor further testified that at some point during the family's outing, defendant received a phone call. Taylor recalled that after receiving the call, defendant said that he was glad he was with Taylor "because something just went down, and they probably would try to blame it on me." After leaving city hall, the family went to Taylor's bank to get a printout of Taylor's account details. The family then went to a Chinese restaurant before returning home around 5:00 p.m.

On cross-examination, the prosecution revisited the details of these events, questioning Taylor comprehensively about his testimony that defendant was with him on the afternoon of November 21, 2012. Among other details, Taylor indicated, as he had during direct examination, that he was unsure whether he had paid his water bill that day and reiterated that the main reason the family had gone to city hall was to transfer the property out of his name and into the names of defendant and defendant's sister. Taylor repeated that defendant had received a phone call and that afterward, defendant had commented that he was glad to be with Taylor because something had happened that might

---

[6] A Saginaw city administrator testified that the deed was entered into the city's computer system at 3:42 p.m. on November 21, 2012.

7

be blamed on defendant. Taylor also stated that he did not hear defendant's phone ring, possibly because defendant had the phone on vibrate.

After direct examination, cross-examination, and redirect examination, the judge signaled that he had some questions for Taylor: "I have some questions. I want to stress to the jury, I have no preference, again, on—as a result of the questions I'm asking." The judge then proceeded to question Taylor extensively. The judge first asked Taylor to clarify whether the transferred property was in his name or in Lee's name. Taylor repeated his testimony that title had previously been transferred from Lee's name to his name and that Lee wanted him to transfer the property to the grandchildren's names because of her cancer diagnosis. The judge continued:

> *The Court*: But wait a minute. I'm getting confused. Legally, who had the title to that house?
>
> [*Taylor*]: [Defendant] and [defendant's sister] got it right now.
>
> *The Court*: All right. Prior to November 21st, whose name was the house in?
>
> [*Taylor*]: My name.
>
> *The Court*: All right. Back to my point. If she got sick, was she on the title at all at that point?
>
> [*Taylor*]: No.
>
> *The Court*: When you say it was her house—I'm sorry. Are you married, or were you married to her at that time?
>
> [*Taylor*]: No, we've just been going together.
>
> *The Court*: That's where I am getting confused then.
>
> [*Taylor*]: But it was—
>
> *The Court*: How did you get the house if you say it was her house?

[*Taylor*]: It was—

[*Defense Counsel*]: Your Honor, I've got to object. That's been asked and answered. He said that she put the house in his name, and then she said that she wanted—after she found out that she was sick that she wanted the house in the kids' name, and that's what he did.

*The Court*: Well, that isn't what I'm hearing. On November 21st of 2012, was the house legally in your name at that point?

Switching gears, the judge probed Taylor's account of the family's activities. The judge first asked how the family got to city hall and questioned defendant's whereabouts the night before. Despite the fact that Taylor had indicated on several occasions that he was unsure whether he had paid the water bill, the judge asked Taylor if he paid the water bill before the property transfer was made. Taylor repeated that he was not sure whether he had paid the water bill. But the judge pressed further, asking whether Taylor had received a receipt of payment, whether the receipt was timestamped, and whether Taylor had the receipt. Taylor replied, once again, that he did not know if he had even paid the bill on that day.

The judge then quizzed Taylor regarding his testimony that the family went to the bank after leaving city hall. The judge asked where the bank was located and what Taylor did at the bank. Taylor responded, as before, that he went to get a printout of his account details. The judge then asked Taylor if he had a copy of that printout, which precipitated the following exchange:

[*Defense Counsel*]: Your Honor, I've got to object. It's—I don't know what you're doing here. I have documents that we've entered into evidence that shows that he was there.

*The Court*: You've alleged an alibi defense, and I want to—I'm going through—I want to know what this gentleman did. It's not clear in my mind

9

whether he paid the bill that day. First he thought he paid it, now he didn't pay it, went to the bank, and I'm entitled to ask questions.

[*Defense Counsel*]: Your Honor, and I've got to object. I think you're being very prosecutorial in this—

*The Court*: Your objection is noted.

Over defense counsel's objection, the judge continued to seek proof that Taylor went to the bank. The judge asked whether Taylor got a "sheet" from the bank, where the sheet was, whether there was a date on the sheet, and the name of the bank official he talked to while there.

The judge next investigated Taylor's testimony that defendant had received a phone call while with Taylor. In response to the judge's question, Taylor repeated that he was not sure of the exact time defendant received the call. The judge then stated:

Okay. You don't remember the phone ringing—and I'm not being critical of you. I just want to understand what you're saying. You don't remember the phone ringing, you don't remember seeing [defendant] with the phone, but you do remember [defendant] saying he got a phone call and words to the effect, I'm glad I'm with you, because something happened or something went down?

Taylor reiterated that he did not hear defendant's phone ring, positing again that defendant had it on vibrate. The judge proceeded with various questions concerning what exactly defendant had told Taylor after the phone call. At this point, Taylor paused, stating, "[W]ait a minute, you trying to confuse me." The judge pressed on, asking Taylor whether he had sought more information from defendant about the phone call: "Okay. Did you say what happened? Why? What do you mean, grandson? What are you talking about? Did you say anything like that?"

10

The judge then targeted Taylor's response to learning that defendant was a suspect in the shooting. When Taylor confirmed that he had learned about a warrant for defendant's arrest about six months to a year after the incident, the judge asked whether Taylor did anything in response. When Taylor seemed confused by the question, the judge asked, "Did you talk to [the police officers] at all and say, hey, you got the wrong guy, my grandson was with me?" When Taylor answered that he had not, the judge replied, "Why not?" Taylor explained that the police had not contacted him, to which the judge retorted, "How would they know to call you?"

Immediately after the judge's questioning of Taylor, the jurors indicated that they too had questions for Taylor. In essence, the jury submitted the following questions, largely echoing the judge's lines of inquiry:

- Do you know of any phone records of the call defendant received at city hall?

- Do you know who called defendant when you were at city hall?

- Is there proof that you were at the bank?

- If you have something that was printed out at the bank, do you have a copy of that document?

- Did you at any time see defendant with a phone in his hand? and

- Did you see defendant with anything at the city hall?

While reading the jury's questions out loud, the judge noted the similarities: "I think these are some of the similar questions I asked."

## B. ALESHA LEE

Although Lee was listed as a defense witness, the prosecution called her to testify during its case-in-chief. With respect to defendant's activities on November 21, 2012,

11

Lee's testimony largely paralleled Taylor's, providing support for defendant's alibi defense. Lee testified that she went to city hall with Taylor, defendant's sister, and defendant to sign over property to defendant and defendant's sister. Like Taylor, Lee explained that she wanted the grandchildren to have the home in case her health declined. Like Taylor, Lee recalled that the family filled out paperwork at city hall, went to the bank, ate at a Chinese restaurant, and then returned home.

After both the prosecution and the defense questioned Lee in detail regarding these events, the judge also questioned the witness. The judge asked Lee which piece of property she signed over to defendant, and who lived at the home. The judge then asked: "Okay. Do you have any paperwork at all?" Defense counsel objected, indicating, "That's for the defense's case. We have the case." The judge answered: "I'm entitled to ask questions, I'm not taking any position one way or the other. I could care less. This is for you to decide. But if you're going [sic] cover it in there, then I'll withdraw the question."

## C.  JOSHUA COLLEY

During its case-in-chief, the prosecution also called Colley, who had been with Galvin when Galvin was shot. More than two months after the shooting, Colley was interviewed by the police about what had occurred on that day. Colley provided a statement describing the vehicle and its approach. Colley indicated that he saw three people with guns lean out the window, and he described what happened as bullets were flying. But Colley told the police that he was unable to identify any of the people in the vehicle. Colley was shown a photo array containing images of defendant and his codefendants, but he did not make an identification.

12

During direct examination at trial, Colley changed his account. Contrary to his earlier statement, Colley testified that he, in fact, never saw the car from which shots were fired. He instead claimed that he was texting on his phone when he heard gun shots, hit the ground, and then "blacked out." When the prosecutor confronted Colley with his earlier statement, Colley claimed that he could not remember the details contained within the statement because he was high on drugs at the time of the shooting. He claimed that the information in the statement was based on what others had told him. Colley also testified that neither he nor Youngblood knew who the shooters were: "I told him I don't know. I said I asked him. He said he didn't know. So he never—he never seen no faces, man." After direct examination, cross-examination by all the defense attorneys, redirect examination, recross-examination, and a second redirect examination by the prosecutor, the judge indicated that he too had some questions.

First, the judge sought to confirm with one of the attorneys the length of Colley's statement. After being informed that it was 38 pages long, the judge confronted Colley:

> *The Court*: Thirty-eight pages. So you talked to these police officers for 38 pages, and they've asked you about all these questions and answers that you gave, and you're saying now none of that is correct?

> [*Colley*]: I don't remember none of that, sir. Like I said, I told you all what I remember. I was high from Promethazine, Codeine, marijuana and Xanax. That cause some blackouts.

> *The Court*: But one of your dear friends, your home boys as you called him, was murdered that day in front of you—

> [*Colley*]: Right.

> *The Court*: —laying [sic] on the ground bleeding to death, and you believe it's important to talk to the police after and let them know what you know happened?

13

[*Colley*]: Right.

*The Court*: And you did talk to them and you heard what you told them at that time.

[*Colley*]: But I was going on what somebody else had told me.

*The Court*: Did you at any time in that statement tell them, I don't—that I don't know what happened?

[*Colley*]: No.

*The Court*: You didn't say, hey, I don't know, I don't know, I don't know, I don't know. You gave these other answers, correct?

[*Colley*]: I told you, man. I was high off Promethazine, Codeine, marijuana and Xanax.

Not finished, the judge then asked the prosecutor directly, "Did anyone in that statement . . . did he—did he give a response, I don't know, I was high[?]" Defense counsel for codefendant Granderson interjected that he did not believe it was procedurally correct to ask the prosecutor such a question, but the judge insisted that he could ask questions to "shorten this up." The judge returned to Colley, stating, "Are you saying that when these questions were asked of you at [sic] the officer back at the time you gave the statement you said, I don't know, I was high?" Colley began, "Listen, I—" but was interrupted by the judge as follows: "That wasn't your answer, was it?" Colley said, "No, I was going on what somebody else told me." The judge replied, "Did you tell them that?" Colley admitted that he had not.

Next, the judge inquired into gang associations, first asking whether Colley was friends with defendant and the codefendants. Colley responded that they were not and that it had surprised him that defendant and his codefendants were charged because no one had known the identities of the shooters. The judge then asked, "So you have no problem if

14

Ranger—excuse me, if Officer Shaft, excuse me, were to put you in cells with [defendant's rival gang]?" Colley answered that he would not have a problem. The judge instructed the prosecutor to redisplay a photograph that allegedly showed several individuals making gang signs. Defense counsel objected: "Your Honor, with all respect, I've got to object to this. It appears to me as though the judge is taking the role of the prosecutor." The judge replied: "Not at all. I have no interest in this case and the outcome. I've instructed you on that before, I'm instructing you again, and the Court is entitled to ask questions. I'm entitled to summarize the evidence if I want, and I'm not doing that." The judge proceeded to ask Colley what his friends were doing with their hands in the photographs, and Colley answered that they were just making signals. The judge concluded, "I don't have anything further."

## III. STANDARD OF REVIEW

The question whether a judge's conduct has "denied a defendant a fair trial is a question of constitutional law that this Court reviews de novo." *Stevens*, 498 Mich at 168. "When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review." *Id*. at 164.[7] Rather, "once a reviewing court has concluded that judicial misconduct has denied the defendant a fair trial, a structural error has occurred and automatic reversal is required." *Id*. at 168, citing *Arizona v Fulminante*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

---

[7] In this case, defendant's claim is preserved because defendant objected to the judge's questioning at trial.

15

# IV. ANALYSIS

In *Stevens*, this Court established the appropriate standard for determining when a trial judge's conduct in front of a jury has deprived a party of a fair and impartial trial. "A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 164. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

Evaluating the totality of the circumstances is a fact-specific analysis that involves a consideration of various factors. *Id*. at 171-172. The *Stevens* Court instructed:

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Id*. at 164.]

Because this list of factors is nonexhaustive, a reviewing court "may consider additional factors if they are relevant to the determination of partiality in a particular case." *Id*. at 172. "[T]he aggrieved party need not establish that each factor weighs in favor of the conclusion that the judge demonstrated the appearance of partiality for the reviewing court to hold that there is a reasonable likelihood that the judge's conduct improperly influenced the jury." *Id*. "The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case." *Id*. "Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors." *Id*. at 171-172.

16

## A. THE NATURE OF THE JUDICIAL CONDUCT

In reviewing claims of judicial partiality, a reviewing court must first examine "the nature or type of judicial conduct itself." *Id*. at 172. Improper judicial conduct may come in many forms, including "belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id*. at 172-173. In this case, we are concerned with the trial judge's questioning of witnesses.

In *Stevens*, we noted that under MRE 614(b), a trial judge is generally permitted to ask questions of witnesses.[8] *Id*. at 173. But we warned that judicial questioning has boundaries. *Id*. at 174. "[T]he central object of judicial questioning should be to *clarify*." *Id*. at 173 (emphasis added). "Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Id*. A judge may intervene in a trial to expedite matters, prevent unnecessary waste of time, or clear up an obscurity. *Id*. at 174, citing Code of Judicial Conduct, Canon 3(A)(8).[9]

However, "undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward witnesses . . . may tend to prevent the proper presentation of the cause, or the ascertainment of truth in respect thereto[.]" *Stevens*, 498 Mich at 174, quoting former Canon 3(A)(8) (quotation marks omitted). See also *People v Bigge*, 297 Mich 58, 70; 297 NW 70 (1941) ("It is well known that jurors in

---

[8] MRE 614(b) permits a court to "interrogate witnesses, whether called by itself or by a party."

[9] Canon 3(A)(8) was renumbered to 3(A)(12) on October 25, 2018. 503 Mich ___ (2018).

a criminal case may be impressed by any conclusion reached by the judge as to the guilt of the accused."). Therefore, a judge should not "exhibit disbelief of a witness intentionally or unintentionally" or " 'permit his own views on disputed issues of fact to become apparent to the jury.' " *Stevens*, 498 Mich at 174 (citation omitted). "A judge should avoid questions that are intimidating, argumentative, or skeptical." *Id*. at 175. See also *People v Wilder*, 383 Mich 122, 124; 174 NW2d 562 (1970). In other words, it is appropriate for a judge to ask questions of a witness that are designed to make clearer otherwise unclear, vague, or confusing testimony. *Stevens*, 498 Mich at 173, 175-176; *People v Young*, 364 Mich 554, 558; 111 NW2d 870 (1961) (noting that a judge's authority "encompasses a right to question a witness for the purpose of shedding light on something unclear in the testimony"); *Simpson v Burton*, 328 Mich 557, 564; 44 NW2d 178 (1950) (noting that a trial judge may ask "appropriate questions to produce fuller and more exact testimony"). But it is not the role of the court to impeach a witness or undermine a witness's general credibility. *Stevens*, 498 Mich at 174; *Simpson*, 328 Mich at 564 ("[G]reat care should be exercised that the court does not indicate its own opinion and does not lay undue stress upon particular features of a witness'[s] testimony that might, in the eyes of the jury, tend to impeach him."). A judge's responsibilities do not include emphasizing or exposing potential weaknesses in a witness's testimony or conveying the judge's personal view on whether a witness should be believed. *Stevens*, 498 Mich at 174-175; *Young*, 364 Mich at 558 (noting that a judge's questions or comments should not place "his great influence on one side or the other in relation to issues which our law leaves to jury verdict"); *Loranger v Jageman*, 169 Mich 84, 86; 134 NW 967 (1912) (finding that the defendant was deprived of a fair and impartial trial when "questions of fact were not

18

allowed to go to the jury free from the opinion of the trial judge in relation to them"); Code of Judicial Conduct, Canon 3(A)(12) ("A judge . . . should not be tempted to the unnecessary display of learning or a premature judgment."). Rather, in an adversarial system, it is the litigants' job to demonstrate to the jury, through questioning or other means, that the testimony of a particular witness is incredible, unsubstantiated, or contradictory. Questions from a judge that are designed to emphasize or expose incredible, unsubstantiated, or contradictory aspects of a witness's testimony are impermissible. *Stevens*, 498 Mich at 174-175; *Young*, 364 Mich at 558-559; *Loranger*, 169 Mich at 86.

With this in mind, we examine the judge's questioning of witnesses in this case, beginning with the judge's treatment of Taylor. As previously noted, Taylor's testimony was central to defendant's alibi defense, providing support for defendant's claim that he was with his family at city hall when Galvin was shot at a different location. In its decision, the Court of Appeals acknowledged that the judge's questioning of Taylor was extensive but justified the conduct by characterizing Taylor's testimony as unclear and confusing. *Granderson*, unpub op at 28. We disagree with that assertion.

To the contrary, Taylor's testimony was clear, simple, and straightforward, providing a consistent time line of events during the afternoon in question. Taylor explained that he went to city hall with Lee, defendant, and defendant's sister around 2:00 p.m. to transfer the property. He explained who owned the home and provided the reason Lee wanted the property transferred. He testified that the transfer was completed soon thereafter, and defense counsel entered documentation into evidence to substantiate that testimony. Taylor also indicated, unequivocally and on several occasions, that he could not recall whether he paid his water bill while at city hall. He explained that the

19

family subsequently went to the bank, ate at a Chinese restaurant, and then returned home. There was nothing confusing, vague, or disjointed about this series of events. Rather, it was sequential and detailed. In short, Taylor's testimony was clear.

Whether Taylor's testimony was believable is a different question, the answer to which was critical for both the defense and the prosecution. The defense needed the jury to credit Taylor's testimony to bolster defendant's claim that he was elsewhere when Galvin was shot. Conversely, the prosecution sought to cast doubt on Taylor's credibility to weaken defendant's alibi claim. Indeed, the prosecution cross-examined Taylor extensively to this effect, revisiting the details of his account, testing his memory of the events, and challenging his overall credibility. It was certainly within the role of the prosecutor to challenge Taylor in this fashion; but it was not within the role of the judge. Yet, that is exactly what the judge did. The judge rigorously questioned Taylor in a manner that more closely resembled prosecutorial cross-examination, rather than a mere attempt at clarification. Despite the fact that Taylor had detailed the events several times during examination by the attorneys, the judge revisited those details in a way that undermined Taylor's credibility. For instance, the judge requested that Taylor provide a printout evidencing his transactions at the bank, suggesting to the jury that if he could not, his testimony was not credible. Similarly, the judge requested a receipt from Taylor to validate that he had paid the water bill. When defense counsel objected, the judge responded in a way that reflected an erroneous belief that the judge's questioning had no bounds: "You've alleged an alibi defense, . . . [and] it's not clear in my mind whether he paid the bill that day. First he thought he paid it, now he didn't pay it, . . . and I'm entitled to ask questions." We explicitly denounced such a judicial overstep in *Stevens*. See *Stevens*, 498 Mich at

20

It was not the trial judge's job to drill into defendant's alibi defense or to assess the believability of witnesses presented in support of that defense. Credibility is properly tested in the crucible of cross-examination, not by judicial inquisition. See *Stevens*, 498 Mich at 174; *Simpson*, 328 Mich at 564.[10]

In his questions about the water bill, the judge not only took an impermissible swipe at Taylor's credibility but also mischaracterized the witness's testimony on this point. Taylor had consistently stated that he was unsure whether he had paid the water bill. A lack of memory is not equivalent to a lack of clarity. To the contrary, Taylor was very clear; he was unsure whether he paid the water bill. Instead of letting this unambiguous testimony stand, the judge reframed the testimony as if Taylor had claimed that he had paid the bill. In doing so, rather than clarifying unclear testimony, the judge actually created confusion where there was none. Moreover, the judge suggested that it was the witness who had been inconsistent, undermining Taylor's veracity. Whether intentional or unintentional, this mischaracterization both prevented a " 'proper presentation of the cause' " and weakened Taylor's testimony in a manner that might impeach him. *Stevens*, 498 Mich at 174, quoting former Canon 3(A)(8); *Simpson*, 328 Mich at 564. The judge injected similar confusion into Taylor's clear explanation of who initially owned the property, suggesting incorrectly that Taylor had testified that the property was in Lee's name. Defense counsel objected, noting that Taylor had actually testified that the property

---

[10] The Court of Appeals acknowledged that "many of the trial court's questions could have been interpreted as challenging Taylor's memory and veracity," and that "the jury could have viewed the trial court's questioning of Taylor as having expressed an opinion on his veracity." *Granderson*, unpub op at 28.

was in his own name, but the court rejected that correction: "Well, that isn't what I'm hearing." Again, the judge both mischaracterized Taylor's testimony and inappropriately displayed his own personal view on the consistency of Taylor's explanations. See *Stevens*, 498 Mich at 174-175; *Young*, 364 Mich at 558.

But that was not all. Next, the judge cast suspicion on Taylor's reason for being on the stand. Despite the fact that Taylor's motive for testifying had nothing to do with the clarity of his testimony, the judge implied that Taylor was attempting to cover up for defendant. The judge asked whether Taylor had reported to the police immediately after learning defendant was a suspect: "Did you talk to [the police officers] at all and say, hey, you got the wrong guy, my grandson was with me?" The judge then questioned why Taylor had not done so. Not subtly, the judge was suggesting to the jury that there was an appropriate response, and because Taylor had not taken that approach, his entire testimony was suspect. Although this might be an effective line of inquiry for the prosecution, it was an entirely inappropriate one for the judge. See *Stevens*, 498 Mich at 174-175; *Young*, 364 Mich at 558; *People v Cole*, 349 Mich 175, 196; 84 NW2d 711 (1957); *Loranger*, 169 Mich at 86; Canon 3(A)(12). The judge also signaled to the jury that Taylor's testimony about defendant receiving a phone call might be a lie: "You don't remember the phone ringing, you don't remember seeing [defendant] on the phone, but you do remember [defendant] saying he got a phone call and words to the effect, I'm glad I'm with you, because something happened or something went down?" This can hardly be characterized as a question, and it was certainly an undisguised attempt to impeach Taylor. The judge may not have believed Taylor, but that was not for him to broadcast to the jury. *Stevens*,

22

498 Mich at 174; *Young*, 364 Mich at 558-559; *Simpson*, 328 Mich at 564; *Loranger*, 169 Mich at 86.

Finally, although not necessary to reach our conclusion, we note that none of this was lost on the jury. Immediately after the judge's questioning of Taylor, the jury submitted questions that focused precisely on the points emphasized by the judge. The inquiries included asking for a copy of a bank printout, whether Taylor saw defendant speaking on the phone, and who was on the other end of the line. The similarity was so obvious and striking that the judge himself commented on it. This manifests a fundamental concern we expressed in *Stevens*: "Because jurors look to the judge for guidance and instruction, they are very prone to follow the slightest indication of bias or prejudice upon the part of the trial judge." *Stevens*, 498 Mich at 174 (quotations marks and citation omitted).

In sum, the judge's questioning of Taylor did not serve to clarify any of the issues or produce fuller testimony but, instead, served to impeach and to undermine the witness's general credibility. See *id*. at 173-175; *Simpson*, 328 Mich at 564. The judge's inquiry emphasized potential weaknesses in Taylor's testimony and disclosed what the jury likely interpreted as the judge's personal view on whether the witness should be believed. Thus, the questioning was impermissible. See *Stevens*, 498 Mich at 174-175; *Young*, 364 Mich at 558; *Simpson*, 328 Mich at 564; *Loranger*, 169 Mich at 86; Canon 3(A)(12). For these reasons, the judge's questioning of Taylor weighs in favor of concluding that the judge pierced the veil of judicial impartiality.

The judge's questioning of Taylor alone is enough to weigh this factor in favor of a determination that the court pieced the veil of judicial impartiality. But in considering the

23

totality of the circumstances, we also note that aspects of the judge's questioning of Lee and Colley were similarly problematic. Lee's testimony, like Taylor's, supported defendant's alibi defense. And Lee's testimony, like Taylor's, was clear. She testified about a series of factual events that occurred on November 21, 2012, from her perspective. Rather than allow this unambiguous testimony to stand, the judge tested Lee's account. Similar to his questions to Taylor regarding the bank printout, the judge requested physical proof from Lee that the property had been transferred: "Okay. Do you have any paperwork at all?" The judge's suggestion here was that if Lee did not have documentation, her testimony should be viewed with skepticism. Again, rather than clarifying an unclear matter, the judge was attempting to expose incredible or unsubstantiated testimony, permitting his view on a disputed issue to become evident to the jury. See *Stevens*, 498 Mich at 174; *Young*, 364 Mich at 558-559.

Likewise, several aspects of the judge's examination of Colley were not clarifying in nature but were, instead, argumentative, reflected skepticism, and undermined the witness's credibility. See *Stevens*, 498 Mich at 174-175; *Wilder*, 383 Mich at 124. Colley testified that he did not see the vehicle approach, did not see the occupants inside the car, and did not remember what happened during the shooting itself, all in contrast to details provided in his prior statement. This could be considered a weakness in Colley's trial testimony, one that the prosecution indeed emphasized during its examination of the witness.

However, the judge inappropriately participated in the adversarial process by engaging the witness in a way that further emphasized this potential weakness: "So, you talked to these police officers for 38 pages, and they've asked you about all these questions

24

and answers that you gave, and you're saying now none of that is correct." The judge then underscored his own disbelief of Colley's explanation: "But one of your dear friends, your home boys as you called him, was murdered that day in front of you[.]" As with Taylor, the judge's subsequent inquiry employed recognizable cross-examination techniques, with the judge posing leading questions in a way that cast further doubt on Colley's trial testimony. At one point, the judge even invited the prosecutor to weigh-in, asking the prosecutor directly whether Colley had ever told anyone that he was high at the time of the shooting. The inappropriateness of this solicitation was immediately recognized and objected to by codefendant Granderson's defense counsel.

And finally, as he had done with Taylor, the judge again targeted a witness's underlying motive for testifying in defendant's favor. The trial judge implied that Colley was scared of defendant and his codefendants, posing his own subtle threat to Colley to make this point: "So you have no problem if . . . Officer Shaft . . . were to put you in cells with [defendant's rival gang]?" This intimidating question and severe attitude toward the witness was patently inappropriate. See *Stevens*, 498 Mich at 174-175; *Wilder*, 383 Mich at 124; Canon 3(A)(12). As with Taylor and Lee, it was the prosecution's job to highlight any incredible, unsubstantiated, or contradictory aspects of Colley's testimony, but it was not within the purview of the judge. See *Stevens*, 498 Mich at 174-175.

For these reasons, the nature of the judge's conduct weighs in favor of concluding that the judge pierced the veil of judicial impartiality.

## B. THE TONE AND DEMEANOR OF THE JUDGE

Next, we examine the tone and demeanor of the trial judge. *Id.* at 172. Often, "this factor will dovetail with analysis of the nature and type of judicial conduct; the manner in which the judge's inquiry is made will affect how the jury perceives the conduct. To the extent that it is appropriate, these factors may be considered together." *Id.* at 186.

Because of the jury's inclination to follow the slightest indication of bias on the part of the judge, "[t]o ensure an appearance of impartiality, a judge should not only be mindful of the substance of his or her words, but also the manner in which they are said." *Id.* at 175. Though appellate courts typically do not witness a trial judge's tone and demeanor first hand, a judge's hostility, bias, or prejudice can sometimes be gleaned from the nature or choice of the words used by the judge or the series or structure of the court's questions. *Id.* at 186; *Cole*, 349 Mich at 197-200. " '[T]he judge should avoid a controversial manner or tone.' " *Stevens*, 498 Mich at 174, quoting former Canon 3(A)(8). "Pert remarks and quips from the bench have no place in the trial of a criminal case . . . ." *People v Neal*, 290 Mich 123, 129; 287 NW 403 (1939). Adversarial cross-examination of a witness by a judge is impermissible. *Stevens*, 498 Mich at 186; *Cole*, 349 Mich at 196 ("[H]ostile cross-examination of a defendant in a criminal prosecution is a function of the prosecuting attorney and . . . a judge before whom a jury case is being tried should avoid any invasion of the prosecutor's role."). Judicial questioning might be more necessary when confronted with a difficult witness who refuses to answer questions or provides unclear answers. *Stevens*, at 175-176. But judicial intervention is less justified when a witness provides clear, responsive answers, or has done nothing to deserve heated judicial inquiry. *Id.* at 175; *Cole*, 349 Mich at 199 ("The record does not disclose any action or tone of voice on

26

the part of the witness which in anywise threatened the orderly conduct of the trial. It would seem that the trial judge could have dealt with these matters with less heat."). "[A]n objection by trial counsel may specifically note the inappropriateness of the judge's demeanor in the courtroom," though no such objection is required to conclude that a judge's tone or demeanor was inappropriate. *Stevens*, 498 Mich at 176.

Beginning again with Taylor's testimony, the Court of Appeals concluded that nothing in the record indicated that the trial judge's tone with Taylor was argumentative or skeptical. *Granderson*, unpub op at 28. Again, we disagree. First, we note that Taylor was not a difficult witness who refused to answer questions or provided unclear answers. As explained earlier, Taylor provided clear, responsive answers during both direct examination and cross-examination. Nonetheless, as described, the trial judge treated Taylor with hostility and took a prosecutorial tone in questioning the witness. Indeed, a review of the record reveals several instances in which defense counsel specifically objected to the trial judge's approach, clearly stating that it was argumentative[11] and prosecutorial.[12] These record objections alone signal that judicial questioning had gone awry.

---

[11] For instance, during one exchange, defense counsel objected: "Your Honor, I've got to object. That's been asked and answered." The judge responded, "Well, that isn't what I'm hearing." At another point, defense counsel objected: "I don't know what you are doing here. I have documents that we've entered into evidence that shows he was there." The judge shot back, "You've alleged an alibi defense, . . . and I'm entitled to ask questions." In context, these pert remarks and quips were inappropriate. See *Neal*, 290 Mich at 129.

[12] On two separate occasions, defense counsel explicitly objected that the judge's questioning seemed prosecutorial. During Taylor's testimony, counsel stated: "Your Honor, and I've got to object. I think you're being very prosecutorial in this[.]" During

The judge's words and the structure of his questions to Taylor also indicated a skeptical, confrontational approach. For instance, during one exchange, the judge asked whether Taylor had told the police, "hey, you got the wrong guy, my grandson was with me?" The judge then asked, "Why not?" And he followed that question by then asking, "How would they know to call you?" This series of questions suggested that the judge considered Taylor's actions illogical or unnatural, casting doubt on the truthfulness of Taylor's testimony. In another instance, the judge essentially asked how it was possible that Taylor did not remember defendant's phone ringing and did not remember defendant on the phone but was nonetheless able to remember that defendant had received a phone call and what defendant had said after the call.[13] The judge's supposed assurance, "I'm not being critical of you," in fact acknowledged that one might interpret his questions in such a way. Other phrases, such as "if you say it was her house" and "[w]ell, that's not what I'm hearing," further demonstrated that the judge did not find Taylor's testimony believable. In challenging Taylor's testimony regarding defendant receiving a phone call,

---

Colley's testimony, defense counsel stated: "Your Honor, with all respect, I've got to object to this. It appears to me as though the judge is taking the role of the prosecutor." The Court of Appeals seems to have entirely overlooked defense counsel's clear objection to the judge's tone, inaccurately writing, "It is worth noting that no objection was raised to the trial court's tone." *Granderson*, unpub op at 21.

[13] The court asked:

> Okay. You don't remember the phone ringing—and I'm not being critical of you. I just want to understand what you're saying. You don't remember the phone ringing, you don't remember seeing [defendant] with the phone, but you do remember [defendant] saying he got a phone call and words to the effect, I'm glad I'm with you, because something happened or something went down?

the judge peppered Taylor with questions without even giving the witness a chance to respond: "Okay. Did you say what happened? Why? What do you mean, grandson? What are you talking about? Did you say anything like that?" This style of rapid-fire questioning, about a subject that did not require clarification, served only to discredit Taylor. There was nothing Taylor had done to deserve such intense confrontation by the judge. See *Stevens*, 498 Mich at 175-176; *Cole*, 349 Mich at 199. Taylor even expressed concern about the effect of the judge's combative nature, at one point hesitating and stating, "[W]ait a minute, you trying to confuse me."

Additionally, the judge appears to have believed that he could permissibly make substantive points or arguments during his questioning. For instance, when engaging Taylor with respect to who had legal title to the property, the judge declared: "All right. Back to my point." In the context of witness questioning, a judge is not tasked with making points or arguments; that responsibility is reserved for the litigants. See *Stevens*, 498 Mich at 174-175; *Young*, 364 Mich at 558-559; *Cole*, 349 Mich at 196. In perhaps an even more illustrative and concerning example, the judge responded to a defense objection: "You've alleged an alibi defense, . . . [and] it's not clear in my mind whether he paid the bill that day. First he thought he paid it, now he didn't pay it, . . . and I'm entitled to ask questions."[14] A judge is not "entitled" to test the validity of a party's claim or defense. A judge is *permitted* to ask questions of a witness, but when the judge chooses to do so, the judge assumes the great responsibility of asking questions in accordance with the law.

---

[14] The court suggested a similar entitlement during Lee's testimony: "I'm entitled to ask questions."

MRE 614(b); *Stevens*, 498 Mich at 174; *Young*, 364 Mich at 558; *Simpson*, 328 Mich at 564; Canon 3(A)(12). Questions that, in essence, advocate are not within that prescribed judicial authority. *Stevens*, 498 Mich at 174-175; *Young*, 364 Mich at 558; *Simpson*, 328 Mich at 564.

Defense counsel's objections, as well as the content and structure of the judge's questions, make it clear that the judge confronted a responsive witness, Taylor, in a hostile, prosecutorial fashion. That tone and demeanor had no place in this trial. Accordingly, this factor too weighs in favor of a determination that the court pierced the veil of judicial impartiality.

Although not necessary in reaching this conclusion, we also note that the judge's combative exchange with Taylor occurred against the backdrop of his exchanges with Lee and Colley, which exhibited similarly problematic aspects. In asking whether Lee had any documentation "at all" to substantiate the property transfer, the judge was signaling that a lack of documentation would indicate a lack of truthfulness. And as discussed previously, the court took an intimidating, threatening tone with Colley, asking whether he would be willing to be placed in a cell with allegedly rival gang members. In other places, the judge's comments were obviously skeptical of Colley's testimony. As had been the case with Taylor, the judge posed several leading questions, culminating with questions that revealed the judge's personal disbelief: "You didn't say, hey, I don't know, I don't know, I don't know, I don't know. You gave these other answers, correct?" On a few occasions, the judge interrupted Colley to drive home a point—that Colley had not told anyone that he was high at the time of the shooting—but what these exchanges drive home to us is the judge's incorrect belief that his purview included witness impeachment. A judge should

avoid the interruption of attorneys or witnesses, except to clarify. See *Stevens*, 498 Mich at 174. In this case, the judge did not take such care.

In sum, the judge's tone and demeanor were hostile, argumentative, and prosecutorial. Therefore, this factor weighs in favor of a determination that the court pierced the veil of judicial impartiality.

## C. THE CONTEXT AND THE SCOPE OF THE JUDICIAL INTERVENTION

In *Stevens*, this Court directed that "a reviewing court should consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein." *Id*. at 176.

In applying this factor to this case, the Court of Appeals seems to have misunderstood the full extent of our directive. The Court of Appeals concluded that extensive judicial questioning was appropriate solely because this trial was a "long and complex one" that spanned 18 days and involved eyewitness testimony, expert witnesses, DNA evidence, and other scientific analysis. *Granderson*, unpub op at 22. This is an incomplete application of our instruction in *Stevens*. In *Stevens*, we did note that in a long or complicated trial, "it may be more appropriate for a judge to intervene a greater number of times than in a shorter or more straightforward trial." *Stevens*, 498 Mich at 176. However, the focus is not solely on whether the trial *itself* was long or complicated. The *Stevens* Court explained that an appellate court must consider "the scope of the judicial conduct in the context of the length and complexity of the trial, *as well as the complexity of the issues therein*." *Id*. at 187-188 (emphasis added). In other words, a reviewing court should not simply evaluate whether the trial as a whole was long or involved complicated

issues. A reviewing court must *also* evaluate *the complexity of the particular issues* that were subject to judicial inquiry. "[A] judge's inquiries may be more appropriate when a witness testifies about *a topic* that is convoluted, technical, scientific, or otherwise difficult for a jury to understand." *Id*. at 176 (emphasis added). In contrast, when a witness testifies on a clear or straightforward issue, judicial questioning is less warranted, even if the testimony occurs within the context of a lengthy trial, or one that involves other complex but unrelated matters. Said differently, when testimony deals with a particular issue or topic that is not complicated or complex, the utility of judge-led questioning is more limited.

Applying this factor correctly leads to a different result than that reached by the Court of Appeals. Despite the length of this trial as a whole and the complexity of other unrelated issues, the specific testimony that was subject to the challenged judicial inquiry was not technical, convoluted, or scientific. Taylor testified about a relatively straightforward matter: his factual account of the events on the day of the shooting. The jury was capable of understanding and assessing this time line without significant judicial intervention. Yet the judge intervened extensively and inappropriately, as already explained.[15] Therefore, this factor also supports the conclusion that the judge pierced the veil of judicial impartiality.

---

[15] We add that neither Lee's testimony nor Colley's testimony was complex. Lee testified to a similar factual time line as Taylor, which was not difficult for the jury to understand. The judge's question about whether Lee could produce any paperwork to substantiate her account did not clarify any technical or convoluted point, and the question was therefore unnecessary. See *Stevens*, 498 Mich at 176. Colley testified about factual matters in a way that arguably contradicted his prior statement. The prosecution was well-positioned to

32

## D. THE EXTENT TO WHICH THE JUDGE'S CONDUCT WAS DIRECTED AT ONE SIDE MORE THAN THE OTHER

Additionally, in conjunction with the previous factor, "a reviewing court should consider the extent to which a judge's comments or questions were directed at one side more than the other." *Id*. at 176-177. "Judicial partiality may be exhibited when an imbalance occurs with respect to *either* the frequency of the intervention *or* the manner of the conduct." *Id*. at 177 (emphasis added). This inquiry is therefore twofold: in order to determine whether judicial questioning was imbalanced, a reviewing court must evaluate *both* the frequency of the questions *and* the manner in which they are asked. For instance, in *Stevens*, we noted that the judge's questions were imbalanced in frequency because they were directed at the defense witnesses more often than the prosecution witnesses. *Id*. at 188. But we also found an imbalance in manner and style: the judge's questioning of defense witnesses served to undermine their testimony, while the judge's questioning of the prosecution witnesses served to bolster the prosecution's case or further weaken the defendant's case. *Id*. at 188-189. See also *Cole*, 349 Mich at 194-195 (determining that judicial bias existed when the judge vigorously cross-examined defense witnesses but did not vigorously cross-examine prosecution witnesses). In other words, to assess whether judicial questioning was imbalanced, we do not simply look at the number of questions but also the nature of those questions.

---

challenge these relatively basic inconsistencies, and the jury was fully able to come to its own conclusions on the matter, without judicial involvement. Nevertheless, the judge confronted Colley repeatedly, in argumentative fashion. This, too, was unwarranted. *Id*.

In this case, the judge's questions were imbalanced in both frequency and manner. As detailed previously, the judge questioned Taylor extensively and often did so in a contentious fashion that revealed the judge's disbelief in Taylor's testimony. The judge also engaged both Lee and Colley in a skeptical manner. When directed at defense witnesses, or defendant-friendly prosecution witnesses, the judge's questioning was frequent, as well as combative, hostile, and designed to impeach.

The prosecution's side of the case, however, was not subjected to equal judicial treatment. The judge asked a limited number of questions of prosecution-friendly witnesses, and the questions asked were generally clarifying in nature. Of particular note is the court's treatment of Youngblood, a key witness for the prosecution. Youngblood, like Colley, provided arguably inconsistent testimony, making representations at trial that conflicted with his earlier statements. But in contrast to the judicial barrage of questions aimed at Colley, who testified favorably for defendant, the judge did not ask a single question of Youngblood.[16] This discrepancy highlights the imbalance that occurred in this case. See *Stevens*, 498 Mich at 177; *Cole*, 349 Mich at 188-189.

In its analysis, the Court of Appeals failed to observe the stark difference between the trial judge's treatment of witnesses on opposing sides of this case. On the whole, the judicial questioning was imbalanced in both frequency and manner, decidedly in favor of

---

[16] The prosecution argues that there was no need for the judge to question Youngblood because Youngblood's testimony was more extensive than Colley's. The comparative length of the witnesses' testimonies is not the issue. Rather, the concerning issue is that the judge questioned Colley in ways that emphasized inconsistencies in his testimony while the judge left untouched inconsistencies in Youngblood's testimony, thus subjecting the two sides to unequal judicial treatment.

the prosecution and against the defense. This too supports a conclusion of judicial partiality.

## E. THE PRESENCE OF A CURATIVE INSTRUCTION

"Finally, we consider the presence or absence of curative instructions." *Stevens*, 498 Mich at 190. A "curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct." *Id.* at 177. However, a judge's administration of curative instructions does not always guarantee that a defendant has received an impartial trial; "in some instances judicial conduct may so overstep its bounds that no instruction can erase the appearance of partiality." *Id*. at 177-178. See also *In re Parkside Housing Project*, 290 Mich 582, 599-600; 287 NW 571 (1939) (holding that the effect of the judge's conduct was "too vitiating" to be corrected, even though the judge issued repeated instructions that he was present only in an advisory capacity and that the determination of the verdict was in the jury's hands). This factor is not considered in isolation but, rather, "the totality-of-the-circumstances test requires that this factor be considered alongside the others." *Stevens*, 498 Mich at 190.

As already detailed, in this case, the judge delivered preliminary instructions that indicated that the judge might ask some questions of the witnesses and that the questions were not meant to reflect the judge's opinion but, rather, to develop issues that might not have been fully explored. In his final instructions, the judge explained that he did not intend to exhibit any opinion during the case and that if the jurors believed the judge had expressed such an opinion, it should be disregarded. Further, the judge reiterated some of these points before questioning Taylor and during his questioning of Colley, indicating that

he was entitled to ask questions but that they were not meant to reflect his personal position on how the case should be decided.

On the facts of this case, these instructions cannot cure the judicial bias that was shown throughout the trial. Although the preliminary instruction indicated that the judge would limit his inquiry to clarifying questions, the judge did not follow through on this assurance. As already described, the judge repeatedly challenged defendant's favorable witnesses in a manner that was not clarifying but, instead, combative and prosecutorial. This gave little meaning to the judge's preliminary and final instructions that he did not intend to express an opinion.

Even the judge's instructions during witness testimony could not right the ship given the extent and inappropriate nature of the questioning. In questioning Taylor, although the judge told the jury he had no preference, his lengthy badgering of the witness suggested the opposite. Given the importance of Taylor's testimony to defendant's alibi defense, the judge's supposedly curative instructions were left particularly empty. Similarly, during Colley's testimony, though the judge stated that he had no interest in the case's outcome, the judge engaged Colley in an impermissible fashion that suggested that the judge did indeed have an opinion on several aspects of Colley's testimony. The judge's comment during Colley's testimony that he was entitled to ask questions resembled more of a rebuke of defense counsel and a declaration of judicial authority, rather than a curative instruction. Indeed, such language was eerily similar to the language we criticized in *Stevens*, 498 Mich at 182, wherein the judge declared, " '[Defense counsel], if I have a question I can ask a question, all right?' " The judge's statement during Lee's testimony also resembled more

36

of a curt retort than a curative action when the judge declared that he was "entitled to ask questions" and that he "could care less" about the outcome of the case.

In essence, the judge's words repeatedly conflicted with his actions. Therefore, the judge's instructions did not cure his impermissible conduct. See *Stevens*, 498 Mich at 177-179; *In re Parkside*, 290 Mich at 599-600.

## V. CONCLUSION

In this case, considering the totality of the circumstances, we conclude that it was reasonably likely that the judge's conduct with respect to defendant's alibi witness improperly influenced the jury by creating the appearance of advocacy or partiality against defendant.[17] The nature of the judicial questioning, the judge's tone and demeanor, the scope of the intervention in light of the relatively straightforward testimony at issue, and the imbalanced direction of the intervention all support our conclusion that the judge pierced the veil of judicial impartiality. Although the judge issued several curative instructions to the jury, these instructions were not enough to overcome the partiality the judge exhibited against defendant throughout the trial. Consequently, we reverse the

---

[17] As detailed in this opinion, we conclude that the trial judge's treatment of Taylor created the appearance of advocacy or partiality against defendant. To reach this conclusion, we considered the totality of the circumstances, evaluating the judge's treatment of other witnesses, including Lee and Colley. See *Stevens*, 498 Mich at 164, 171-172. However, because the judge's treatment of Taylor is enough to satisfy defendant's claim of judicial impartiality, we need not determine whether the judge's treatment of Lee or Colley would have served as separate bases for concluding that the judge pierced the veil of judicial impartiality.

judgment of the Court of Appeals and remand the case to the Saginaw Circuit Court for a new trial.[18]  We do not retain jurisdiction.

Richard H. Bernstein
Bridget M. McCormack
David F. Viviano
Elizabeth T. Clement
Megan K. Cavanagh

---

[18] Because we decide this case on the grounds of judicial partiality, we decline to address the other issues raised by defendant on appeal.  Additionally, because the trial judge in this case has retired, we do not consider whether this case should be retried before a different judge.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF MICHIGAN,

        Plaintiff-Appellee,

v                                  No. 154684

KAREEM AMID SWILLEY, JR.,

        Defendant-Appellant.

_____

MARKMAN, J. (*concurring in the judgment*).

I agree with the majority that certain aspects of the trial judge's questioning in this case were inappropriate. However, I agree with Justice ZAHRA that this Court need not decide whether this inappropriate questioning violated defendant's constitutional rights under *People v Stevens*, 498 Mich 162; 869 NW2d 233 (2015), because the trial judge's episodic inappropriate questioning constituted an abuse of discretion under MRE 614(b) and defendant can show that "it is more probable than not that a different outcome would have resulted without the error." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). Accordingly, I agree that a new trial is warranted, but only for the reasons provided in Justice ZAHRA's concurring opinion, which I join in full.[1]

---

[1] The majority declines to address whether on remand defendant should be retried before a different judge because the trial judge in the original proceeding has retired. While I agree with the majority's decision not to order that this case be retried before a different judge, I would decline to do so for the additional reason that appellate courts should only order retrial before a different judge in the most compelling cases of improper judicial questioning and I do not believe that the questioning here rose to that level.

I write separately for two primary reasons. <u>First</u>, I write to emphasize that the goal of judicial questioning is to assist the jury in its truth-seeking function without compromising the jury's ability to independently render a verdict. Thus, when engaging in judicial questioning, trial judges should consider (a) whether the answer to the question posed is likely to aid the jury in ascertaining the truth and thereby to render a just verdict that protects the innocent, deters and punishes the guilty, and ensures domestic tranquility; and (b) whether the asking of the question is likely to improperly influence the jury by suggesting that the judge has a personal opinion regarding the credibility of the witness or the strength of the parties' positions. <u>Second</u>, I am concerned that the majority opinion takes an unnecessarily negative tone toward judicial questioning and that, as a result, it may unfortunately make members of the bench hesitant to invoke their authority under MRE 614(b) to "interrogate witnesses." Because I believe that judicial questioning, when used appropriately, provides an indispensable aid to juries in their fundamental task of uncovering the truth, I would not unduly hamper a trial judge's ability to ask such questions by engaging in overly aggressive appellate review.

## I. JUDICIAL QUESTIONING

This Court has long recognized the inherent authority of a trial judge to question witnesses in jury trials. See, e.g., *In re Stockdale's Estate*, 157 Mich 593, 606; 122 NW 279 (1909) ("We do not question the right or the duty of the circuit judge to question witnesses, and to see that the facts are properly brought before the jury[.]"); *People v Noyes*, 328 Mich 207, 212; 43 NW2d 331 (1950) ("The trial court was within his rights in questioning defendant's witnesses as well as the complaining witness."). This is

consistent with the common law of the United States as a whole, which has generally recognized the authority of a judge to question witnesses during jury trials. See, e.g., FRE 614(b), advisory committee notes ("The authority of the judge to question witnesses is . . . well established."); 1 McCormick, Evidence (7th ed), § 8, pp 37, 44. In 1978, that inherent authority was codified in MRE 614, which was modeled on FRE 614. MRE 614 provides, in relevant part:

> (a) Calling by Court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

> (b) Interrogation by Court. The court may interrogate witnesses, whether called by itself or by a party.

Therefore, this Court has properly recognized that judicial questioning is "generally appropriate under MRE 614(b)." *Stevens*, 498 Mich at 173.[2]

More recently, this Court amended MCR 2.513 as part of a larger jury-reform effort to, among other things, enable a judge to "fairly and impartially sum up the evidence" presented at trial. MCR 2.513(M). While judicial questioning long predates the 2011 enactment of the jury-reform amendments, it serves largely the same purpose as do those amendments, namely, to "assist those citizens who are performing their civic duty as jurors" and, more specifically, "to further the rule of law, and necessarily the search for truth upon which this depends, by affording jurors the fullest possible

---

[2] While this case involves a criminal trial, a trial judge has the authority to question witnesses in both criminal and civil trials. Criminal cases are distinct from civil cases to the extent that criminal defendants have constitutional protections that are inapplicable to civil litigants. Nevertheless, I believe that the principles regarding judicial questioning set forth in this concurring opinion apply equally to criminal and civil cases.

assistance of our legal system in apprehending the cases and controversies before them." MCR 2.512 through MCR 2.516, 489 Mich cxcvi, cxcviii (MARKMAN, J., concurring). In short, this Court has concluded that judicial questioning "advance[s] the judiciary's duty to assist the jury in ascertaining the truth," *People v Anstey*, 476 Mich 436, 456; 719 NW2d 579 (2006), and that the benefits of such questioning outweigh its costs. Thus, trial judges are entrusted to exercise their sound judgment to assist juries in the critical task of assessing the evidence presented and in rendering an accurate verdict that protects the innocent, deters and punishes the guilty, and ensures domestic tranquility.

However, judicial questioning is not intended to replace advocates' presentation of the evidence-- which is the primary source of factual development at trial-- but, rather, to supplement this presentation by filling in, or highlighting, gaps that may remain after examination by the parties.[3]

> Under the Anglo-American adversary trial system, the parties' counsel have the primary responsibility for finding, selecting, and presenting the evidence. However, our system of party-investigation and party-presentation has limitations. The system is a means to the end of disclosing truth and administering justice. In order to achieve that same end, the judge may exercise various powers to intervene to supplement the parties' evidence. [McCormick, § 8, p 37 (citations omitted).]

---

[3] "[T]here may be some instances in which parties *do not want* jurors to be engaged. There are cases in which attorneys want confusion and doubt, where they want the jurors to nullify or render a verdict on the basis of passion unconnected to any facts. However, the role of the juror is to render a verdict on the basis of the law and the facts, and it is this Court's responsibility in its supervision of our state's justice system to bear *this* interest principally in mind so that the rule of law can be effected." 489 Mich at cxcviii (MARKMAN, J., concurring) (quotation marks omitted).

Judicial questioning assists the jury in its search for the truth by "supplement[ing] the parties' evidence" in at least three ways. *Id*. First, judicial questioning can clarify unclear or unresponsive testimony from a witness. *Stevens*, 498 Mich at 175-176; see also, e.g., *Ray v United States*, 367 F2d 258, 261 (CA 8, 1966) ("Where the testimony is confusing or not altogether clear the alleged 'jeopardy' to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion."). Second, judicial questioning can better enable the jury to connect the evidence presented and to organize that evidence into a comprehensive whole to create a logical narrative of the allegations and events at issue. Third, judicial questioning can uncover new information that was not brought to light by the parties, whether intentionally or unintentionally. *Stevens*, 498 Mich at 173 ("[I]t is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information."). Because "the primary objective of criminal procedure is to facilitate the ascertainment of truth," *Anstey*, 476 Mich at 456 (quotation marks omitted), a trial judge should not hesitate to exercise his or her authority to question witnesses in appropriate circumstances to assist the jury in its search for the truth.

Of course, as this Court has recognized, a trial judge's authority to question witnesses is not boundless or without reasonable limits. Central to the American legal system is the proposition that the jury is the fact-finder in most criminal and civil trials, not the judge. See Const 1963, art 1, § 14; US Const, Ams VI and VII; see generally *People v Lemmon*, 456 Mich 625, 636-642; 576 NW2d 129 (1998). Indeed, in large part, "the preservation of the jury by constitutional amendment was designed as a limitation on

5

judicial power." *Id*. at 639. "[B]ecause judges wield enormous influence over juries, judges may not ask questions that signal their belief or disbelief of witnesses." *United States v Tilghman*, 328 US App DC 258, 260-261; 134 F3d 414 (1998). See also *Stevens*, 498 Mich at 176. For the same reason, it is improper for judges to ask questions that signal their belief in the strength of the evidence presented against or in favor of a particular party. See *People v Bigge*, 297 Mich 58, 72; 297 NW 70 (1941) ("Once the door is open for allowing the opinion of the court to be impressed upon jurors that one charged with crime is guilty of the offense, the fundamental right of trial by jury is impaired."). Such questioning is inappropriate because it corrodes the independence of the jury by giving rise to the possibility that the jury's verdict is essentially the product of the judge's attitudes concerning the evidence presented, rather than the jury's evaluation of the evidence. See *United States v Perez-Melis*, 882 F3d 161, 165 (CA 5, 2018) ("The jury cannot be regarded as having freely come to its own conclusions about a witness's credibility when the court has already indicated, directly or indirectly, that it disbelieves his testimony.").

In summary, trial judges should bear in mind that the primary purpose served by judicial questioning is to assist the jury in its search for the truth. This search is indispensable to our justice system because "if the trial does not effectively develop the facts and comprehensibly present them to the fact-finder, trial justice is serendipitous," rather than a reliable judgment of a party's guilt or innocence. Strier, *Making Jury Trials More Truthful*, 30 UC Davis L Rev 95, 99 (1996). However, it is equally important that the trial judge assist the fact-finder without also signaling to the jury its personal views concerning the evidence presented, as even such inadvertent signaling might unduly

6

influence the jury and thus undermine its role as an independent fact-finder. While there is undeniably a tension between these competing judicial interests, I am confident that the trial judges of this state will, subject to the imperfections that will inevitably arise in any such balancing process, serve the critical interests of truth in the criminal-justice process by exercising their questioning authority in a manner that facilitates this purpose while also preserving and maintaining the integrity of the jury process.

## II. APPELLATE REVIEW

Just as trial judges must be mindful of the purposes of judicial questioning when posing such questions, appellate judges must also be mindful of these purposes when reviewing a trial judge's decision to pose such questions. I agree with the majority that *Stevens* sets forth a number of appropriate factors for an appellate court to consider in determining whether, *under the totality of the circumstances*, a trial judge's questioning of witnesses was appropriate. However, there are certain aspects of *Stevens* and the majority opinion in this case that warrant concern and that require further explication so as to avoid unduly "chilling" the bench from engaging in appropriate judicial questioning of witnesses, questioning that furthers the truth-seeking function of the criminal trial.

First, while I agree with *Stevens* and the majority that the "central object of judicial questioning should be to clarify," 498 Mich at 173, I note that clarification can come in many forms and, as previously discussed, the ultimate goal of this clarification is to assist the jury in discovering the truth and to thereby reach a just verdict. Therefore, I believe the majority oversimplifies matters when it asserts that "it is not the role of the court to impeach a witness or undermine a witness's general credibility" and that

7

"[c]redibility is properly tested in the crucible of cross-examination, not by judicial inquisition." Witness credibility is inextricably intertwined with the jury's truth-seeking function, and therefore judicial questioning touching on witness credibility may well assist the jury in responsibly carrying out that function. Accordingly, judicial questioning with the intention or effect of impeaching a witness is not thereby improper. Rather, such questioning is improper only to the extent that the judge's questions communicate the judge's *personal opinion* regarding the witness's credibility. While the line is admittedly a fine one, appellate courts must be cautious in reviewing judicial questioning to distinguish between impeaching questions that communicate a trial judge's personal opinion of a witness's credibility and those that do not.

Second, while *Stevens* and the majority are correct that a judge's questioning should not favor or disfavor a particular party by reflecting that judge's personal opinion regarding the evidence presented, this does not mean that it is somehow improper for a judge to ask questions that reveal information harmful to one of the parties. "[A] question [from a judge] is not improper simply because it clarifies evidence to the disadvantage of the defendant. The rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover." *United States v De La Cruz-Feliciano*, 786 F3d 78, 84 (CA 1, 2015) (quotation marks and citations omitted); see also *Com v Festa*, 369 Mass 419, 422; 341 NE2d 276 (1976) ("There is no doubt that a judge can properly question a witness, albeit some of the answers may tend to reinforce the [prosecutor's] case, so long as the examination is not partisan in nature, biased, or a display of belief in the defendant's guilt."). The key inquiry, once again, is whether the

8

questioning signals to the jury the judge's personal opinion as to the veracity of the witness or as to the strength or weakness of a party's case, not whether the question itself is intended to, or results in, harm to a particular party's case.

Third, while *Stevens*, 498 Mich at 173, 176, and the majority rightly note that the clarity of a witness's testimony and the complexity or simplicity of the subject matter of that testimony is relevant to determining whether judicial questioning has been appropriate, a witness's testimony that appears clear when read from a cold transcript does not necessarily signify that judicial questioning was inappropriate, even if such questioning was in some respects repetitive of questions posed by counsel. The trial judge has the advantage of observing tone and body language and therefore can discern a lack of clarity, or a lack of understanding, that may be imperceptible on appellate review. For example, if the witness mumbled or spoke quickly during a portion of his or her testimony, this may well justify repetitive judicial questioning yet not be apparent on the face of an appellate transcript. See *People v Paille #2*, 383 Mich 621, 627; 178 NW2d 465 (1970) ("We have often commented upon the fact that the judge who hears the testimony has the distinct advantage over the appellate judge, who must form judgment solely from the printed words."). Moreover, the judge may observe that a juror is conversing with another juror or is otherwise distracted during a key portion of a witness's testimony. In that situation, having a witness repeat a previous answer might well aid the jury in its deliberative process. Because trial judges are simply better positioned to observe such specific factual circumstances than are appellate judges, appellate courts should be cautious in concluding that exercises in repetitive questioning,

even on issues that might appear relatively straightforward, necessarily constitute an improper exercise of discretion under MRE 614(b).

Fourth, and relatedly, while *Stevens*, 498 Mich at 168, and the majority are correct that whether judicial questioning violates a defendant's constitutional right to a fair trial is reviewed de novo, when conducting that review, appellate courts must remain cognizant of the trial judge's superior ability, discussed above and throughout the criminal law, to determine which questions might be of greatest assistance and value to the jury. In other words, appellate courts should provide an ordinary measure of deference to a trial judge's exercise of authority under MRE 614 because trial judges are generally better situated than appellate judges to determine the propriety and value of asking particular questions that might assist the jury in its role as fact-finder. To the extent that there is uncertainty in an appellate record as to the factual circumstances under which judicial questioning has occurred, appellate courts should generally give some reasonable deference to the proposition that the questioning was warranted.

Fifth, notwithstanding this Court's references to the Code of Judicial Conduct in *Stevens*, 498 Mich at 174, and in this case, improper questioning that entitles a party to a new trial should only rarely result in a judicial-disciplinary proceeding. As already discussed, proper judicial questioning constitutes a vital tool in the ascertainment of the truth and therefore trial judges should not be reluctant, or even hesitant, to employ that tool when it is appropriate. The trial judge should not be disinterested or neutral in the search for truth in the criminal-justice process. However, employment of this tool is likely to be disincentivized if the trial judge is concerned that his or her questioning may result in charges of misconduct and accompanying disciplinary proceedings. As with any

10

other exercise of judgment, there will be occasions on which a trial judge errs (as in the instant case) such that a party will be entitled to a new trial. I believe these will be rare occasions, as they have been with regard to our bench in countless other realms in which judgment must be exercised. In the end, trial judges are entitled to a strong presumption that any such errors were undertaken in good faith and do not more generally reflect on their fitness for the bench, as to me-- most likely inadvertently-- is suggested by the majority's overly casual references to the Code of Judicial Conduct. As this Court recently explained, "legal errors, standing alone, generally do not suggest the existence of judicial misconduct." *In re Gorcyca*, 500 Mich 588, 616; 902 NW2d 828 (2017). See also MCR 9.203(B) ("An erroneous decision by a judge made in good faith and with due diligence is not judicial misconduct."). Accordingly, that an appellate court has concluded that a trial judge's questioning of witnesses exceeded proper boundaries should not in the vast majority of cases result in disciplinary proceedings against that judge.

## III. CONCLUSION

"None of the trial's functions are more central to its legitimacy than the search for truth," *Making Jury Trials More Truthful*, 30 UC Davis L Rev at 99, in order to protect the innocent, to deter and punish the guilty, and to further "domestic Tranquility," US Const, pmbl. Judicial questioning, when used appropriately, constitutes a valuable tool for assisting jurors in their search for the truth. Thus, it is entirely appropriate for a judge to question witnesses under MRE 614(b), so long as the questioning does not signal to the jury that judge's personal opinion in a way that corrodes the jury's exercise of its

11

function as the ultimate fact-finder. Within such boundaries, judges bear wide discretion to question witnesses, even if these questions touch on issues of credibility or reveal evidence that is damaging to a party's case. Moreover, appellate courts should afford reasonable deference to a trial judge's decision to question witnesses, because trial judges are generally better positioned than appellate judges to determine what questioning would be of most assistance and value to the jury. However, as discussed in both the majority and Justice ZAHRA's opinions, certain aspects of the trial judge's questioning in the instant case may have suggested to the jury the court's personal opinion regarding the credibility of witnesses and the strength of the parties' respective cases. Because this error was ultimately not harmless, I concur in the Court's judgment remanding for a new trial, albeit with significant reservations as to the overall nature of the majority's analysis.

Stephen J. Markman
Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF MICHIGAN,

        Plaintiff-Appellee,

v                                        No. 154684

KAREEM AMID SWILLEY, JR.,

        Defendant-Appellant.

_____

ZAHRA, J. (*concurring in the judgment*).

I concur in the result reached by the majority; defendant's convictions should be reversed, and he should receive a new trial. Unlike the majority, however, I do not reach this conclusion because the trial judge pierced the veil of judicial impartiality under this Court's decision in *People v Stevens*.[1] Rather, I concur in the result reached by the majority because the trial judge abused his discretion under MRE 614(b), an error that was not harmless. Accordingly, I write separately to express my view that there is a clear nonconstitutional basis for adjudicating defendant's claim.

*Stevens* provides a clear constitutional avenue of relief in the form of structural error when "judicial misconduct has denied the defendant a fair trial . . . ."[2] Under the *Stevens* standard, we are to consider the totality of the circumstances to determine whether "it is

_____

[1] *People v Stevens*, 498 Mich 162; 869 NW2d 233 (2015).

[2] *Id*. at 168, citing *Arizona v Fulminante*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party."[3]  "In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions."[4]  As noted in *Stevens*, an "overall appearance of advocacy or partiality" can arise when the judge's questions are hostile.[5]  This type of misconduct occurs where the judicial questioning "project[s] incredulity, bias and hostility."[6]  I question whether the sporadic instances of improper judicial questioning in this case violate the standard set forth in *Stevens* given that the challenged judicial conduct in *Stevens* was much more pervasive than in this case.  It was the pervasive appearance of judicial bias that gave rise to a finding of structural error in *Stevens*.[7]

---

[3] *Stevens*, 498 Mich at 171.

[4] *Id*. at 172.

[5] *Id*. at 184.

[6] *Id*. at 186.

[7] Logically, there is a line between proper and improper judicial questioning.  Proper questioning is not erroneous, and improper questioning is erroneous.  And it makes little sense to conclude that crossing the line between proper and improper questioning abruptly transforms instances of "no error at all" into "structural error."  Rather, there should be some range of middle terrain in which it is recognized that minor instances of improper questioning are erroneous but do not rise to the level of structural error.

But I need not determine whether defendant is entitled to a new trial under *Stevens*. In general, courts should not reach constitutional issues in cases that can be resolved on nonconstitutional grounds.[8]  And this case can be resolved on a nonconstitutional ground: the trial court's evidentiary error under MRE 614(b).  Under MRE 614(b), "[t]he court may interrogate witnesses, whether called by itself or by a party."  As aptly explained in Justice MARKMAN's concurrence, "the goal of judicial questioning is to assist the jury in its truth-seeking function without compromising the jury's ability to independently render a verdict."[9]  Thus, judicial questioning has a proper role in the administration of justice.

But the mere fact that a trial court is authorized to ask questions does not mean that it has free rein and unfettered discretion to interrogate witnesses in any manner it chooses.[10] This case involved a long and complex trial, spanning 18 days, with four defendants and a large amount of evidence and testimony, including eyewitness testimony, expert witnesses, DNA evidence, scientific analysis of bullet casings and weapons, and evidence of other events that bore relevance to this matter.  This is the exact type of trial in which judicial questioning is generally appropriate, if not necessary, to ensure the judge has a

---

[8] *People v Riley*, 465 Mich 442, 447; 636 NW2d 514 (2001); see *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993).

[9] *Ante* at 2 (MARKMAN, J., concurring).

[10] See, e.g., *United States v Roach*, 502 F3d 425, 441-442 (CA 6, 2007), and *United States v Flores*, 488 F Appx 68, 69 (CA 6, 2012) (reviewing for an abuse of discretion the trial courts' respective decisions to call and question witnesses under FRE 614(b), which substantially resembles MRE 614(b)); see also *United States v Adedoyin*, 369 F3d 337, 342 (CA 3, 2004); *McMillan v Castro*, 405 F3d 405, 409 (CA 6, 2005); *Fielding v United States*, 164 F2d 1022, 1023 (CA 6, 1947).

comprehensive understanding of the testimony and can conduct the trial in an orderly fashion.

While I find no abuse of discretion with regard to the majority of his questioning, the trial judge did, at times, cross the line of acceptable questioning by interrupting and interjecting himself in the testimony of Philip Taylor, a key alibi witness for defendant. "At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome."[11] An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of reasonable and principled outcomes.[12] In this case, there was no principled basis for the trial judge to repeatedly interrupt and mischaracterize, in the presence of the jury, Taylor's testimony regarding whether he had paid his water bill when he traveled with defendant to their municipal complex to allow defendant to execute a transfer of real property. As the majority explains, Taylor testified regarding his factual account of the events on the day of the crimes—a relatively simple, noncomplex matter. Nevertheless, the trial judge intervened extensively, which disrupted, rather than assisted, the jury's ability to determine the truth of the material matters to which Taylor testified.[13]

The trial court continued its questioning even in the face of objection from defense counsel that the court was appearing prosecutorial. In particular, Taylor testified that he

---

[11] *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

[12] *Id*.

[13] Another example of this unwarranted intervention is the trial judge's extensive probing into Taylor's activities at the bank and asking whether Taylor had proof of any transactions.

4

"might have" paid his water bill on the day of the shooting, yet the trial judge pressed him on whether he had proof of payment, including whether any receipts he had were time stamped. Taylor's testimony as to what he recalled doing on the day of the shooting, such as whether he paid his water bill, was not material to whether defendant was with Taylor at the time of the shooting. But Taylor's credibility and veracity were paramount to defendant's alibi defense that he was with Taylor and Alesha Lee at the time of the shooting and that he therefore could not have been present at the crime scene. The trial court's questioning in this respect episodically crossed the line from judicial impartiality to advocacy. And the admission of evidence in response to such questioning amounted to an abuse of discretion. Because I conclude the trial judge abused his discretion when asking several of his questions posed to Taylor, I would hold this line of questioning to constitute error under MRE 614(b).

A preserved claim that a trial judge committed an abuse of discretion under the Michigan Rules of Evidence implicates the harmless-error standard for preserved, nonconstitutional error.[14] Accordingly, in such a case, remand for a new trial is only warranted when the defendant can show that "it is more probable than not that a different outcome would have resulted without the error."[15] Defendant has met his burden of establishing that it is "more probable than not" that the jury would have acquitted him absent the alleged improper questioning.[16] In particular, defendant's alibi rested on two

---

[14] MCL 769.26; *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (reiterating "that [MCL 769.26] controls judicial review of preserved, nonconstitutional error").

[15] *Lukity*, 460 Mich at 495.

[16] *Id*.

5

categories of evidence: (1) text message correspondence between defendant and codefendant Terrance Demon-Jordan Thomas, Jr., and (2) Taylor's testimony that defendant was at city hall when DaVarion Galvin was shot to death. The evidence against defendant was not overwhelming, and the trial came down to a credibility determination. Because the trial judge interjected confusion into Taylor's testimony and injected improper doubt into Taylor's credibility, which was absolutely paramount to defendant's alibi defense, it is more probable than not that the jury would have acquitted defendant absent the improper questioning. For these reasons, I would grant defendant a new trial.

Because I would grant defendant relief on the nonconstitutional basis of this evidentiary error, I would not apply *Stevens*'s constitutional standard to determine whether the trial court's judicial questioning amounted to structural error.

Brian K. Zahra
Stephen J. Markman
